**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Criminal No. 14-10104-WGY |
| | ) | |
| **OSCAR HERNANDEZ, JR.,** | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND**
**REQUEST FOR UPWARD VARIANCE**

## I.   INTRODUCTION

From time to time the sentencing guidelines do not account for the full scale of criminal conduct of a defendant.  The government, no longer bound by the limitations of mandatory sentencing guidelines under United States v. Booker, 543 U.S. 220 (2005), has been authorized, and better yet encouraged, to exercise its discretion in recommending an appropriate sentence for defendants.[1]

The government seeks an upward variance in this matter – a recommendation that the undersigned has made sparingly, only on a handful of prior occasions.  But this is not a typical case.  And that is not because the evidence developed here demonstrated that the defendant, Oscar Hernandez, Jr. ("OSCAR") obtained and shipped firearms to former New England Patriots football player, Aaron Hernandez, or that three of the guns provided by OSCAR were recovered

---

[1] "In the *typical case*, the appropriate balance among these [statutory sentencing] purposes will continue to be reflected by the applicable guidelines range, and prosecutors should generally continue to advocate for a sentence within that range." Memorandum from Eric H. Holder, Jr., Attorney Gen., U.S. Dep't of Justice, to all Federal Prosecutors 2 (May 19, 2010)(emphasis added).

during the course of the homicide investigation of victim, Odin Lloyd.2  Nor is the case different because OSCAR lied to the grand jury to protect himself, Aaron Hernandez, and others from criminal responsibility; nor that OSCAR obstructed justice by delaying the investigation; nor that OSCAR attempted (unsuccessfully) to influence the testimony of a grand jury witness.  Instead, the case is not typical because it involves all of this diverse criminal conduct, each troublesome in nature and all warranting a degree of punishment.

The government's recommendation, consistent with its plea agreement with the defendant, is that the Court impose a sentence of 32 months incarceration followed by three years of supervised release.  The government arrives at this recommendation by thoughtfully and reasonably requesting the Court impose a sentence the reflects each of the distinct courses of criminal conduct (for ease of reference 1) "the gun transportation conspiracy"; and 2) "the lying, obstruction and witness tampering").  The government asserts that this significant sentence is also warranted here for several additional, and more traditional reasons, discussed below.

---

2       Some of this evidence was provided to state prosecutors and introduced during the recent trial of Commonwealth v. Aaron Hernandez, docket # BRC2013-983-A to C.  Hernandez was convicted by the jury of first degree murder and two counts of illegal gun possession.  More specifically, count C involved his illegal possession of the FEG, 7.62 X 39 rifle, sn: HF0372, purchased by James Joseph from the Del Ray Shooting Center in Florida.  This rifle was shipped by OSCAR and found in backseat of the Toyota Camry in Aaron Hernandez's garage with his palm print on it.

## II.   BACKGROUND

In the Presentence Report ("PSR") the United States Probation Office determined that OSCAR's base offense level was 14. (PSR at ¶91). The PSR also added four-levels for a role in the offense adjustment (PSR at ¶94), and two-levels for obstruction of justice (PSR at ¶95). With the three-level reduction for prompt acceptance of responsibility, the total offense level was then set at 17. (PSR at ¶91). The PSR established that OSCAR's criminal history category was I (PSR at ¶107). The applicable guideline sentencing range determined by the Probation office was therefore set at 24-30 months. (PSR at §146).

In the plea agreement, the U.S. Attorney calculated the guidelines as follows:

- With respect to Counts One through Five:

    ◦ in accordance with USSG §2J1.3(a), Defendant's base offense level is 14; and

    ◦ in accordance with USSG §2J1.3(b)(2), Defendant's offense level is increased by three levels, because Defendant's offense resulted in substantial interference with the administration of justice.

- With respect to Count Six:

    ◦ in accordance with USSG §2K2.1(a)(7), Defendant's base offense level is 12;

    ◦ in accordance with USSG §2K2.1(b)(1)(A), Defendant's offense level is increased by two levels because the offense involved between three and seven firearms; and

    ◦ in accordance with USSG §3C1.1, Defendant's offense level is increased by two levels, because Defendant

> willfully obstructed and attempted to obstruct the administration of justice with respect to the investigation and prosecution of this offense.
>
> - Under USSG §§3D1.2 and 3D1.3, Defendant's total offense level (prior to any adjustment for acceptance of responsibility) is 17, because the offense level for Counts One through Five is higher than that for Count Six.

See plea agreement, paragraph 3.

With the three-level reduction for prompt acceptance of responsibility, the total offense level is then 14. The PSR established that OSCAR's criminal history category was I (PSR at ¶107). Accordingly, the applicable guideline sentencing range determined by the government is therefore 15-21 months.

The government further agreed in the plea agreement to recommend a sentence of incarceration of not more than 32 months. See plea agreement, paragraph 4(a).

Consistent with its agreement, and the rationale supporting it, the government seeks a sentence of 32 months incarceration. The government asserts that this significant sentence is warranted here. The government also seeks a term of supervised release of three years with certain conditions.

### III. FACTS OF THE CASE

The facts of the case are described in detail in the PSR at pages 4-24, ¶¶9-82. Accordingly, the following is just a brief summary. (See PSR at ¶¶9-14).

On July 8, 2013, the United States Attorney's Office opened an investigation involving the unlawful transportation of firearms from

4

Florida to Massachusetts. During the course of the investigation, agents from Massachusetts made several trips to Florida, issued subpoenas for records, and secured the testimony before the grand jury of numerous witnesses. OSCAR was interviewed in Florida on two occasions and subpoenaed to appear before the grand jury.

OSCAR provided false testimony to the grand jury on at least three separate points: 1) that he did not purchase a Toyota Camry (that we believe was used to store and ship the firearms to Aaron Hernandez); 2) that he did not ship the Toyota Camry to Aaron Hernandez's house in North Attleboro, Massachusetts; and 3) that he did not ask DB to ship the Toyota Camry concealed inside the back of DB's tractor-trailer truck.

OSCAR attempted to tamper with a grand jury witness during the course of two recorded telephone calls that he made with the seller of the Toyota Camry, KS, in which OSCAR attempted to influence KS's upcoming grand jury testimony. OSCAR also obstructed justice through his false and evasive testimony before the grand jury which delayed the gun trafficking investigation.

The following excerpt from the timeline submitted and referenced in the PSR provides the details of the gun purchases and transportation in a summary fashion. (See PSR at ¶12).

| | |
|---|---|
| 4/8/2013 | Telephone contact between Aaron Hernandez and OSCAR's cell phone numbers. (First contact in 2013 between their known telephone numbers 203-606-8969 and 561-755-0678) |
| 4/9/2013 | OSCAR's cell phone number made a number of phone calls to Aaron Hernandez cell number. |

| | |
|---|---|
| 4/10/2013 | OSCAR contacted KS (later he bought the Toyota Camry from KS) |
| 4/11/2013 | 11:42 a.m. – OSCAR texted Aaron Hernandez |
| | 11:49 a.m. – Aaron Hernandez made a large deposit into his own account |
| | 11:50 a.m. – Aaron Hernandez called OSCAR |
| | 11:53 a.m. – Aaron Hernandez deposited $15,000 into OSCAR's mother's bank account |
| | OSCAR had his mother withdraw $5,000 from her account and provide it to him -- 18 minutes after the deposit into the account |
| 4/11/2013 | OSCAR purchased an IO, 7.62X39 Rifle, sn: 003489, from True Value Hardware. (This gun was never recovered) |
| 4/12/2013 | OSCAR had his mother withdraw another $5,000 from her account and provide it to him |
| 4/2013 | OSCAR purchased a used Toyota Camry for $1,500 (found after the murder of Odin Lloyd in Aaron Hernandez's garage) |
| 4/15/213 | OSCAR was at Delray Beach Shooting Center with friend James Joseph. |
| | James Joseph purchased an FEG, 7.62 X 39 rifle, sn: HF0372, from Del Ray Shooting Center for $1,703.  This rifle was later found in backseat of the Toyota Camry in Aaron Hernandez's garage.  OSCAR was present at the time of the purchase and bought ammunition fitting both the FEG and the IO that he bought 4 days earlier |
| | (After the murder of Odin Lloyd, when confronted regarding this gun, James Joseph later stated that this gun was stolen but never reported it) |
| 4/16/2013 | Gion Jackson, a friend of OSCAR, purchased a .22 Jimenez semi-automatic handgun sn: 1144296, from True Value in Belle Glade, Florida.  OSCAR was present at the time of the purchase |
| | (After the murder of Odin Lloyd, when confronted regarding this gun, Gion Jackson stated that this gun was stolen but never reported it) |
| | Maurice Bynes, a friend of OSCAR purchased a .22 Jiminez semi-automatic handgun, sn: 1131344, from the True Value in Belle Glade, Florida |
| | (After the murder of Odin Lloyd, when confronted regarding this gun, Maurice Bynes also stated that this gun was stolen but never reported it) |
| 4/19/2013 | OSCAR contacted All Day Auto Transport at 866-649-5827, regarding shipping the Toyota to Massachusetts |
| 4/20/2013 | Aaron Hernandez sent texts to OSCAR on Ryan McDonnell's phone |
| 4/22/2013 | OSCAR made a payment of $203.99 to the transport company for the transport of Toyota. |
| 4/23/2013 | OSCAR had telephone contact with Katherine Rabidoux from Premium Transport, 727-272-5718 |
| 4/24/2013 | OSCAR had telephone contact with Katherine Rabidoux from Premium Transport |
| 4/24/2013 | Maurice Bynes picked up the Jimenez Arms, .22 caliber pistol, sn: 1131344, at True Value |
| 4/24/2013 | Telephone contact between telephone numbers of OSCAR and Ernest Wallace. |

|            |                                                                                                                                                              |
|------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            | (First contact in 2013 between their numbers known telephone numbers, 561-755-0678 and 860-845-4304)                                                         |
| 4/25/2013  | The transport company scheduled the Toyota for pick up                                                                                                       |
| 4/26/2013  | OSCAR had telephone contact with Katherine Rabidoux from Premium Transport                                                                                   |
| 4/27/2013  | OSCAR had telephone contact with Katherine Rabidoux from Premium Transport and picked up the Toyota at OSCAR's home in Belle Glade, Florida                  |
|            | OSCAR had telephone contact with Victor Diomedia, who was a driver for Premium Transport                                                                     |
| 4/28/2013  | Ernest Wallace and Aaron Hernandez were in Los Angeles, California, flown there at Aaron Hernandez's expense                                                 |
|            | Aaron Hernandez paid to fly his friend Robert Paradis to Los Angeles for a vacation                                                                          |
|            | Robert Paradis, Aaron Hernandez and Ernest Wallace stayed together                                                                                           |
|            | Aaron Hernandez told Robert Paradis that he had a .45 gun                                                                                                    |
|            | Ernest Wallace called OSCAR at 7:30 p.m.                                                                                                                     |
| 4/29/2013  | Wallace texted OSCAR at 7:32 p.m.                                                                                                                            |
|            | Wallace texted OSCAR at 7:35 p.m.                                                                                                                            |
|            | Wallace texted OSCAR at 7:45 p.m.                                                                                                                            |
|            | Wallace texted OSCAR at 8:29 p.m.                                                                                                                            |
|            | Wallace texted OSCAR at 8:32 p.m.                                                                                                                            |
| 4/29/2013  | Shayanna Jenkins has telephone contact with Katherine Rabidoux from Premium Transport                                                                        |
| 4/30/2013  | Shayanna Jenkins has telephone contact with Katherine Rabidoux from Premium Transport                                                                        |
| 4/30/2013  | Aaron Hernandez and Wallace left together to go to the airport to return to Boston                                                                           |
|            | On way to airport, Aaron Hernandez called Paradis and asked him to check on a firearm in drawer.  Paradis found the gun in the drawer                        |
|            | Aaron Hernandez and Ernest Wallace flew back from LA to Boston together                                                                                      |
|            | Aaron Hernandez rented an SUV from Hertz (NJ plates) at Logan Airport                                                                                        |
| 5/1/2013   | Shayanna Jenkins had telephone contact with Katherine Rabidoux from Premium Transport                                                                        |
| 5/1/2013   | Shayanna Jenkins had telephone contact with Victor Diomeda, who was a driver for Premium Transport                                                           |
|            | The Toyota Camry was delivered to Aaron Hernandez in North Attleboro, MA                                                                                     |
|            | Aaron Hernandez returned to his home in North Attleboro                                                                                                      |
| 5/1/2013   | The Toyota Camry was stored in Aaron Hernandez's garage                                                                                                      |
| 5/19/2013  | The Jimenez Arms, .22 caliber pistol, sn: 1131344, purchased by Maurice                                                                                      |

|           | Bynes was recovered in Providence, RI outside a nightclub, in the area where Wallace and Aaron Hernandez had just left |
|-----------|---|
| 6/17/2013 | Odin Lloyd was found murdered in North Attleboro, MA |
| 6/19/2013 | The Jimenez Arms, .22 caliber pistol, sn: 1144296, purchased by Gion Jackson was recovered in North Attleboro, MA near scene of murder |
| 6/22/2013 | The FEG, 7.62X39 rifle, sn: HF0372, purchased by James Joseph was recovered in the trunk of the Toyota Camry parked in the garage at 22 Ronald C. Myer Drive, North Attleboro, MA with Aaron Hernandez's palm print on it. |

Lastly, as described above, the evidence developed established a conspiracy between OSCAR, Aaron Hernandez and others, to purchase firearms in Florida and to deliver the firearms to Aaron Hernandez in Massachusetts. More particularly, Aaron Hernandez funded the conspiracy by providing OSCAR with $15,000 for OSCAR and others to buy the guns over the course of the seven days after OSCAR received the funds; for OSCAR to buy the Toyota Camry to ship the guns inside; for OSCAR to pay for the transportation of the car; and for Aaron Hernandez's girlfriend, Shayanna Jenkins, to pay for the receipt of the car in Massachusetts.

## IV.   §3553(a) FACTORS

The government points out several areas under the 3553(a) factors that warrant comment supporting its position that an upward departure and a 32 months sentence is appropriate.

### 1.   Nature of the Offenses

The offenses of conviction are significant in their seriousness: counts one through three alleging False Declarations before the Grand Jury, in violation of 18 U.S.C. § 1623; count four alleging Obstruction of Justice, in violation of 18 U.S.C. § 1503; count five alleging Witness Tampering, in violation of 18 U.S.C. §

8

1512; and count six alleging Conspiracy to Transfer a Firearm from an Unlicensed Person whose Residence is in a State Different from Transferor's, in violation of 18 U.S.C. §§ 922(a)(5) and 371.

### A) The gun transportation conspiracy

With respect to the conspiracy to transport firearms aspect of the case, there is a steady supply of illegal guns into Massachusetts cities.  For example, in 2012 ATF traced 1600 guns seized through law enforcement efforts in the state.  See ATF website at https://www.atf.gov/search/site/trace%20information%20guns%20massachusetts.  In 2013, the number of guns seized and traced dipped slightly to 1571.  Id.  Stemming the supply of illegal guns into Massachusetts requires an ongoing effort by law enforcement.  For example, in 2012 only 453 of the guns traced were originally purchased in Massachusetts, leaving an alarming total of 1147 guns that were purchased outside of this state.  Id.  And the data from 2013 is nearly the same.  In 2013, only 431 of the guns traced were originally purchased in Massachusetts, with 1140 guns that were purchased outside of this state.  Id.

The State of Florida, where OSCAR obtained and shipped guns to Massachusetts from, is a significant source of illegal guns.  In 2012, Florida was the source of 45 guns recovered in Massachusetts, and 51 Florida guns were recovered and traced in Massachusetts in 2013.  See Id.

The use of such guns in violence is also epidemic in this country. One need only read the newspaper each day to recognize the seriousness of gun violence and the need to deal with firearms trafficking cases accordingly. See United States v. Politano, 522 F.3d 69 (1st Cir. 2008)(in affirming above-guideline sentence in firearms trafficking case, the First Circuit noted sentencing judge's reference to the "epidemic of handgun violence in communities within this district" and concluded that the district court "has the authority to conclude that the impact of this particular offense is more serious than that reflected by the Sentencing Commission.").

"Gun violence remains a serious public health and safety problem in the United States. In 2009, a total of 9,146 people were murdered with firearms, and it is estimated another 48,158 were treated in hospitals for gunshot wounds received in assaults." Andrew V. Papachristos, Ph.D., Anthony A. Braga, Ph.D. & David M. Hureau, M.P.P., *Six-Degrees of Violent Victimization: Social Networks and the Risk of Gunshot Injury* 3 (February 28, 2011).

Illegal guns used to commit violent crimes are acquired from those persons who procure them, and ship them into this state - like OSCAR. It follows that illegally obtaining, and shipping guns into this state is not a victimless crime.

Here, OSCAR's conduct is both serious in nature and adversely affects victims. Their perspective cannot be overlooked in imposing an appropriate sentence. The access to, and delivery of,

firearms justifies a lengthy period of incarceration.

### B) The lying, obstruction and witness tampering

The next aspect of the case is also serious in nature. OSCAR's efforts at lying to the federal grand jury; obstructing justice by delaying the investigation through his false and misleading testimony; as well as his attempts to influence a grand jury witness all take aim at the heart of the judicial system. See e.g. United States v. Cintolo, 818 F.2d 980, 991 (1st Cir. 1987)(denouncing the obstruction of justice by efforts at influencing a grand jury witness).

OSCAR's repeated lies to the grand jury to protect himself from criminal accountability were compounded by his persistent efforts at improperly influencing a grand jury witness during two recorded telephone calls.3 (See PSR at ¶¶52-58). OSCAR believed that KS did not cooperate with law enforcement during an earlier interview and that KS refused to tell investigators that KS sold the car to him. Id. On at least 13 occasions during the first call, OSCAR told KS to tell the authorities "the same thing". Id. On at least 26 occasions, OSCAR told KS that he never bought the car or KS never sold him the car. Id.

OSCAR continued this theme during the second recorded call. During this very brief telephone call, on at least 14 occasions OSCAR told KS that he never bought the car or KS never sold

---

3   It is of no consequence whatsoever that OSCAR's attempts at tampering with the witness were thwarted by law enforcement.

him the car.  Id.  Perhaps the most telling statement by OSCAR, and the one that cuts to the core of the oath, was during the second call when OSCAR described his prior grand jury appearance:

OSCAR:   Man, I didn't tell them people nothing.  I told them people you don't sell me no car, nothing like that.  Don't let them people trick you (inaudible).  They – they – they tried to tell me you said something.  You know what I'm saying.  I know you ain't saying nothing 'cause you didn't sell me no car.  Don't let them people trick you either. (Inaudible).

This conduct warrants a degree of punishment that is simply inadequately addressed by the sentencing guidelines.

Lastly, defense counsel contends that since the undersigned vigorously confronted OSCAR at the grand jury with records, witness statements and inconsistencies in his testimony, additional punishment for obstruction of justice is unmet.  See Defendant's Sentencing Memorandum, page 2, docket entry 32.  This argument misses the mark.  The government expended time, resources in developing the roles of the coconspirators after OSCAR's efforts to throw the investigators off the trail by lying under oath.  Indeed, numerous additional witnesses were brought before the grand jury from multiple states.

More specifically, the financial link to Aaron Hernandez, in which he provided $15,000 to OSCAR using OSCAR's mother's account was developed much later in the investigation and from a forensic analysis of bank records.  OSCAR, on the other hand, testified that he hardly knew Aaron Hernandez and lied about the source of the money

12

to pay for the guns, car and transportation. OSCAR claimed that he saved the sum of money to buy the guns by mowing lawns.

Through the extent of his testimony, OSCAR not only met the requirements of U.S.S.G. §2J1.2(b)(2) for substantial interference with the administration of justice, the testimony also supports a more significant sentence under the 3553(a) factors.

**2.   Deterrence**

The court should also consider proper deterrence in fashioning a sentence. See 18 U.S.C. § 3553(a)(2)(B)(the district court may impose a sentence "to afford adequate deterrence to criminal conduct").

**A)   The need for specific deterrence**

It's hard to determine just how to effectively communicate any message to a defendant hell-bent on helping another person by obtaining guns and shipping them to him, that it's patently wrong and will not be allowed in this society. Prosecutors have frequently relied upon as a crutch that the defendant has been "down this road before" when seeking enhanced sentences. But OSCAR has a limited criminal history.[4] Clearly, he needs to "get it" after serving federal prison time for the first time and then being monitored by this court's probation office. A much stiffer sentence is necessary

---

[4]   In warrants stating here, the government uncovered no evidence that OSCAR knew of Aaron Hernandez's intended use of the illegal firearms. But that too is not a mitigating factor for OSCAR. Indeed, if there was such evidence collected, it would have been an aggravating factor and the cross reference to the applicable sentencing guideline range would have resulted in a significantly higher sentencing range for OSCAR.

13

to get through to OSCAR that obeying a wide range of criminal laws is not merely a good idea, but comes with sharp consequences for the failure to do so.

### B)   The need for general deterrence

The desire to slow, or for that matter to stop altogether others from following in OSCAR's footsteps is a lofty goal.  However, Massachusetts residents deserve our help.

The requested sentence serves important purposes of general deterrence.  The government requests that a message be sent to others, similarly situated to OSCAR, who may consider illegally shipping guns into Massachusetts.  The message should be unmistakably clear, that delivering illegal firearms into our state will not be tolerated.  See 18 U.S.C. §3553 (a)(1)(B)(sentencing goals include the need to afford adequate deterrence to criminal conduct).  See also United States v. Cavera, 550 F.3d 180, 196 (2d. Cir. 2008)(in affirming above-guideline sentence based on local concerns about gun trafficking, Second Circuit noted that, "The environment in which a crime was perpetrated may, in principle, inform a district court's judgment as to the appropriate punishment in any number of ways").  Deterrence is important because it can work to reduce crime and the misery so often imposed on innocent victims. See, e.g., McDowell et al, "A Comparative Study of the Preventative Effects of Mandatory Sentencing Laws for Gun Crimes," 83 Journal of

Criminal Law and Criminology 378-394 (1992)(mandatory sentences for gun crimes reduced violent crime in six cities).

Deterrence must be effectively communicated. At least one commentator has correctly recognized that "the deterrence threat may best be viewed as a piece of advertising." Zimring and Hawkins, *Deterrence, the Legal Threat in Crime Control,* p.142 (Univ. Of Chicago Press 1973). Through its decisions, this Court is an important messenger to the target audience perpetrating the violence. Compare Skogan et al,(eds) *Fairness and effectiveness in Policing: the Evidence (*National Academies Press 2001) at 6 ("Research has found that people obey the law not just because they are afraid of being punished or because they believe the law is morally right, but also because they believe the law and its enforcement is impartial and being fairly administered") with United States v. Bannister, 786 F.Supp.2d 617, 660 (E.D.N.Y.)("General deterrence particularly may be impaired when the perceived injustice of punishment damages the credibility of the justice system"). On the other hand, messages that take into account the seriousness of gun violence and the need to protect public safety by imposing stiff sentences on traffickers of guns can help make communities safer and deter others from committing the same crimes.

   3.   **Protect the Public**

The danger faced by the public from the shipment of illegal guns

15

into this state is significant and is a proper area for consideration. See 18 U.S.C. § 3553(a)(2)(C)(the district court may impose a sentence "to protect the public from further crimes of the defendant"). In Massachusetts, the average "time to crime" (the duration of time from the original purchase of a gun until it is recovered at a crime scene is *over 13 years*. See ATF website, 2013 data. (emphasis added)

Here, a semi-automatic rifle was purchased by OSCAR on April 11, 2013 – the same day OSCAR received $15,000 from Aaron Hernandez funding the gun trafficking scheme. (See PSR at ¶12). That gun was never recovered. Id. The danger to the public from OSCAR's illegal guns, like from this high-powered semiautomatic weapon, will continue for untold period of time until the gun is recovered by law enforcement.5

## V.    CONDITIONS OF SUPERVISED RELEASE

The government seeks the following special conditions, such as drug treatment, (see PSR at ¶132, defendant admitted to frequent drug use); and seek and maintain employment, (PSR at ¶137, defendant previously worked in a youth camp) and others that the court would ordinarily impose in such a case.

---

5    One of the two .22 caliber Jiminez gun obtained and shipped by OSCAR was recovered on May 19, 2013 outside a Providence nightclub after Aaron Hernandez and Ernest Wallace left the club. (See PSR at ¶13). This discarded gun, recovered in a public area, highlights the danger to the public from these illegal weapons.

16

**VI.   CONCLUSION**

For the foregoing reasons, and consistent with its agreement with the defendant, the government requests that the defendant be sentenced to 32 months incarceration, to be followed by three years of supervised release with the special conditions discussed herein.

```
                          Respectfully submitted,

                          CARMEN M. ORTIZ
                          UNITED STATES ATTORNEY



                    By:   s/ Glenn A. MacKinlay
                          GLENN A. MACKINLAY
                          Assistant U.S. Attorney
```

17

**CERTIFICATE OF SERVICE**

I, Glenn A. MacKinlay, Assistant U.S. Attorney, certify that I caused a copy of the foregoing to be served by efiling on:

COUNSEL OF RECORD

<u>s/ Glenn A. MacKinlay</u>
GLENN A. MACKINLAY
Assistant U.S. Attorney